Karen E. JOHNSON, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.

No. 83–C–1010–C.

United States District Court, W.D. Wisconsin.

May 6, 1988.

Kim R. Genich, Madison, Wis., for plaintiff.

Debra Schneider, Madison, Wis., for defendant.

CRABB, Chief Judge.

No objections have been filed to the Report and Recommendation entered herein by the United States Magistrate on April 19, 1988. Therefore, I adopt his Report and Recommendation as the court's own and order that defendant's decision denying plaintiff's application for social security disability insurance benefits and for supplemental security income benefits prior to August 1, 1983 is reversed and this case is remanded to defendant for a determination of the amount of social security disability insurance benefits and supplemental security income benefits plaintiff is entitled to based on a disability date of April 24, 1982.

## REPORT AND RECOMMENDATION

JAMES GROH, United States Magistrate.

Karen Johnson seeks review of defendant's decision denying her application for Social Security Disability Insurance (SSD) Benefits and for Supplemental Security Income (SSI) Benefits prior to August 1, 1983. Plaintiff contends that defendant's decision that plaintiff does not suffer from the equivalence of a listed impairment and that she had the ability to perform jobs available to her in significant numbers in the economy is not supported by substantial evidence. This Report and Recommendation, submitted pursuant to 28 USC § 636(b)(1)(B), recommends that defendant's decision be reversed.

*Procedural History*

Plaintiff filed applications for SSD and SSI benefits on June 28, 1982. (Tr: 56–59, 60–69)[1] She alleged that she became disabled due to a knee injury on April 24, 1982. (Tr: 56, 61) Defendant denied the claims initially on August 26, 1982 (Tr: 79, 81), and on reconsideration on October 20, 1982. (Tr: 89, 91) On April 22, 1983, a hearing in the matter was held at plaintiff's request before Morton J. Goustin, Administrative Law Judge at Eau Claire, Wisconsin. (Tr: 21) Plaintiff appeared personally and by counsel. (Tr: 21) In a July 21, 1983, decision, Administrative Law Judge Goustin denied plaintiff's application, finding that plaintiff was not disabled either at Step 3 or Step 5.[2] (Tr: 6–13) On September 26, 1983, the Appeals Council denied review and adopted that decision without comment as the Secretary's final decision. Plaintiff filed an appeal with the United States District of the Western District of Wisconsin on February 3, 1984. (Dkt. # 3) On December 18, 1984, the Honorable Barbara B. Crabb adopted the undersigned's recommendation and remanded the case to defendant. Defendant was ordered to consider the new, material evidence which had been presented to the Appeals Council with plaintiff's application for review, but which the Appeals Council failed to consider. (Dkt. ## 10, 11)

On February 21, 1985, the Appeals Council assigned the case to an Administrative Law Judge for further consideration, and a hearing was held on April 4, 1985, before James M. D'Amico, Administrative Law Judge. (Tr: 198) Plaintiff appeared personally and by counsel. (Tr: 196, 198) In an April 26, 1985, recommended decision, Administrative Law Judge D'Amico found that plaintiff had been disabled since April 24, 1982, because she had a listed arthritis impairment (Step 3). (Tr: 336–340) On October 31, 1985, the Appeals Council withheld its final decision and remanded the case to the Administrative Law Judge to receive additional evidence. (Tr: 193–194) After receiving additional evidence Administrative Law Judge D'Amico released a further recommended decision on February

---

1. The transcript is found under three separate docket numbers: pages 1–149 are at docket number 7, pages 150–334 at number 13, and pages 335–346 at number 16.

2. For a description of the steps in the Social Security Benefits process see *infra*, p. 1297.

7, 1986. He found that plaintiff had been disabled at sequential Step 5 since April 24, 1982. (Tr: 342–346) On April 2, 1986, the Appeals Council found that plaintiff was disabled at Step 3 as of December 9, 1985, but withheld its final decision as to her disability before that date and again remanded the decision for a consideration of further evidence. (Tr: 186–189)

The Administrative Law Judge received further evidence (Tr: 278–330) and on September 10, 1986, a third hearing was held before Administrative Law Judge D'Amico with plaintiff again appearing in person and by counsel. (Tr: 207) On January 9, 1987, Administrative Law Judge D'Amico concluded that plaintiff had been disabled only since August 1, 1983. (Tr: 169–174) On June 26, 1987, the Appeals Council modified the Administrative Law Judge's findings to state that plaintiff had been disabled with a listed obesity impairment since August 1, 1983, but that prior to August 1, 1983, plaintiff had neither a listed impairment nor the inability to perform work available in the economy. (Tr: 155–157)[3] This became defendant's final order, and, on August 19, 1987, Judge Crabb granted plaintiff's request for supplemental briefing on the issue of whether plaintiff was disabled as of April 24, 1982. (Dkt. # 14) Jurisdiction exists under 42 USC § 405(g).

*Record Evidence*

Plaintiff was born February 6, 1942, and has a tenth grade education. (Tr: 201–203) She lives in Eau Claire, Wisconsin. (Tr: 202) She has worked in a variety of jobs including operating a power sewing machine, cooking, waiting and dishwashing (Tr: 31–32), but she has not worked since July, 1981. (Tr: 74) Plaintiff is separated and has five stepsons, one adopted son, two children of her own living and two children deceased. (Tr: 202)

The record indicates that plaintiff has long suffered from a weight problem. Dr. Donald V. Blink, a general practitioner who first examined plaintiff at defendant's request, indicated in a letter to plaintiff's attorney dated September 7, 1983, that according to medical records plaintiff's weight fluctuated between 210 pounds and 252 pounds from August 3, 1967, to November 1975. (Tr: 242)[4] She is 5 feet 5 inches tall.[5]

The record indicates that plaintiff first experienced serious back problems on April 5, 1978. On that day she was driving a car and felt something snap in her back when she pushed the clutch. (Tr: 306) Plaintiff saw Dr. Steven Mickelson, a chiropracter, the next day. (Tr: 306) Dr. Mickelson noted that plaintiff had acute subluxations of the lumbo-sacral spine accompanied by localized and referred pain in the legs.[6] (Tr: 306) X–rays taken at the time indicated minor evidence of lumbo-sacral osteoarthritis. (Tr: 307) Dr. Mickelson's treatment is not described, although it apparently included chiropractic manipulation.

Plaintiff was seen by Dr. Claude D. Davis, an orthopedist, on May 3, 1978. (Tr: 107) Dr. Davis reported that plaintiff had been walking with a crooked back although the chiropracter's treatment cleared that problem. He noted that plaintiff still had back pain and muscle spasms. (Tr: 107) Dr. Davis noted that she was markedly overweight. (Tr: 107) His impression was that plaintiff had possible lumbo-sacral disk disease which was resolving.[7] (Tr: 107) He recommended that plaintiff lose weight, apply heat and take Valium. (Tr: 107)

---

**3.** Plaintiff's eligibility for SSD expired on March 31, 1983. (Tr: 174)

**4.** Plaintiff's prior history also included an appendectomy, oral surgery, tubal ligation, hysterectomy and muscular chest pains. (Tr: 246)

**5.** Plaintiff testified to being 5 feet 7 inches. (Tr: 201) The Administrative Law Judge accepted the opinion of Dr. Stephanie J. Jakim, who examined plaintiff at defendant's request and found that plaintiff was 5 feet 5 inches. (Tr:

173, 271) Defendant does not challenge this finding.

**6.** An incomplete dislocation of the spine with accompanying pain in the lower back in which contact between joint surfaces remains although their position changes. *Stedman's Medical Dictionary,* 5th ed. (1984) (*Stedman's*) at 1356, 811.

**7.** Resolving means returning to normal. *Stedman's* at 1222.

The medical record over the next three years is unclear. Dr. Blink's September 7, 1983, letter indicated that plaintiff's weight hovered at about 230 pounds at this time. (Tr: 242) In July 1981, plaintiff was forced to quit her job as a cook at the direction of her daughter's psychiatrist in order to take care of her daughter, the victim of a sexual assault. (Tr: 246, 209)

On November 18, 1981, plaintiff was seen by a Dr. Spitz of Midelfort Clinic in Eau Claire. (Tr: 246) She complained of suffering from a chill. She was noted as being obese at 242 pounds, and having generalized arthralgias.[8] (Tr: 246) Dr. Spitz saw plaintiff again on November 30, 1981, and ruled out thyroid disease. He noted some gland swelling which indicated the possibility of mumps, but only rescheduled her for a visit in 6 months unless the swelling persisted. (Tr: 247)

On April 24, 1982, plaintiff suffered the knee injury which she alleged was the onset of her disability. The hospital record prepared that day by Dr. Douglas Smith of Luther Hospital indicates that plaintiff reported getting out of her recliner when she felt a sharp pain and heard a pop in her left leg which caused her to fall back into the recliner. (Tr: 100) She had pain extending her knee although she could extend it. She had not injured her knee before. (Tr: 100) She could stand on her foot but with discomfort. X-rays showed no specific abnormality from the injury but noted degenerative arthritic changes in the left knee. (Tr: 100, 101) Plaintiff was diagnosed as having a medical collateral ligament strain of the left knee, plus possible cartilage injury, but no muscle tear. (Tr: 100)

Plaintiff was placed on crutches, prescribed Tylenol with codeine for pain and instructed to see a Dr. Kennedy the following week. (Tr: 101) There is no record of Dr. Kennedy's examination.

The record next indicates that plaintiff was examined by Dr. Edgar O. Hicks, an orthopedic surgeon affiliated with Luther Hospital, on May 12, 1982. (Tr: 102, 120) He noted that plaintiff had pain and disuse of her knee since the injury. (Tr: 102) She was still taking the Tylenol. Dr. Hicks noted x-rays showing marked degenerative arthritis. (Tr: 102) He diagnosed plaintiff as having a probable torn medial meniscus,[9] and scheduled her for arthroscopic surgery.[10] (Tr: 102) Dr. Hicks conducted the arthroscopic surgery on May 17, 1982. The surgery revealed no evidence of major meniscal derangement.[11] However, Dr. Hicks noted that plaintiff "had degenerative arthritis throughout the knee." (Tr: 103) He debrided the frayed chondral surface[12] and removed overhanging fat. Plaintiff was discharged from the hospital the next day, to be followed on an outpatient basis. (Tr: 103) There is no report of plaintiff's medication or her mobility upon leaving the hospital.

Plaintiff returned for a follow-up examination on May 25, 1982. Dr. Hicks prescribed Motrin,[13] told her to work on her range of motion and advised her to return in a month. (Tr: 108) She returned on June 17, 1982. Dr. Hicks noted that her progress was extremely slow and that she had several complaints which were not specified. (Tr: 108)

**8.** Arthralgias is severe pain in a joint. *Stedman's* at 124.

**9.** The medial meniscus is a crescent-shaped fibrocartilage disk attached to the inner part of the upper surface of the tibia (the lower bone of the knee joint) in forming the joint at the knee. *Schmidt's Attorney's Dictionary of Medicine* (*Schmidt's*) at K–29, M–83.

**10.** Arthroscopic surgery is the examination of the interior of a joint by use of a device inserted into it. *Schmidt's* at A–336, E–82.

**11.** Derangement is disorder or disturbance. *Stedman's* at 379.

**12.** He removed dead and foreign cartilage. *Stedman's* at 271, 364.

**13.** Motrin is a brand of ibuprofen used for relief of mild to moderate pain and for the treatment of, *e.g.*, rheumatoid and osteo-arthritis. *Physician's Desk Reference* (1986 ed.) (PDR) at 1854. It is available only by prescription. Drug Information, Pharmacy Department, University of Wisconsin Hospital, Madison, Wisconsin. (Drug Information) Ibuprofen is the active ingredient of over-the-counter pain relievers such as Advil and Medipren.

Dr. Hicks next saw plaintiff on July 13, 1982. (Tr: 108) She was still using crutches regularly but Dr. Hicks noted a slight improvement. She also complained of problems in her right knee. Dr. Hicks felt that her problem was degenerative arthritis and strongly encouraged weight loss. (Tr: 108) He told her to return for further examination on a need basis. (Tr: 109)

On July 21, 1982, plaintiff underwent vocational testing at the Trout Vocational Rehabilitation Institute. (Tr: 133–148)[14] Kenneth Bridell was plaintiff's counselor and Richard Davis the evaluator. Plaintiff was on crutches. She noted that she took pain pills each night to sleep. (Tr: 134) Her work limitations were noted to be weight, fatigue and mobility. (Tr: 134) Besides needing more education, plaintiff's physical handicaps were noted as an obstacle. (Tr: 136) She also needed a different type of crutch because the pair she was using irritated scars under her arms. The possibility of using a wheelchair on a limited basis as an aid to mobility was discussed. (Tr: 136) Moving around made her knees swell. The evaluators noted that plaintiff's work pace decreased noticeably by the end of the day as she became fatigued by the demands of the evaluation. This was noted as a possible impediment to the success of the rehabilitation program. (Tr: 136) The report indicated that plaintiff was limited to sedentary work which was defined as "lift max. of 10 lbs; mostly sitting." (Tr: 148) A staffing report attached to the evaluation indicated that plaintiff's work needs and goals were: "Job that is sedentary, requiring very little walking, lifting or carrying." (Tr: 132)

On August 18, 1982, plaintiff was examined by Dr. Donald V. Blink, a general practitioner in Eau Claire, at defendant's request.[15] (Tr: 110, 119) Plaintiff told him that she felt well except for her knees. He noted a list of about 20 complaints regarding how her knees caused pain and prevented her from moving around. (Tr: 110) She weighed 240 pounds at the time. (Tr: 110) Dr. Blink noted she walked with difficulty. No generalized swelling was noted. Much bony crepitus [16] was noted in the right knee although it had a full range of motion. (Tr: 111) The left knee had less crepitation but could be extended only to 30° and flexed only to 90°. (Tr: 111) Dr. Blink's impression was that plaintiff had "Degenerative arthritis, knees severe." (Tr: 111) He observed that plaintiff had been under a weight loss program which had resulted in a two-pound loss in the past week. He stated that the program:

> may improve the pain and difficulty with her knees if she could lose approximately 80 pounds, but I doubt if it will result in significant improvement.

(Tr: 111)

On August 27, 1982, plaintiff was examined by Dr. Harold E. Sorensen of the Midlefort Clinic, an orthopedic surgeon. Dr. Sorensen apparently became plaintiff's personal physician at this time. He noted that plaintiff used crutches and had a great deal of difficulty getting around. (Tr: 247) She complained of pain. (Tr: 247) Examination revealed her to be grossly obese with marked crepitus on the right knee but not the left. (Tr: 247) Dr. Sorensen reviewed the April 24, 1982, x-rays of plaintiff's left knee and noted that:

> [t]hey show narrowing of the joint line and I am sure that she does have degenerative arthritis.

(Tr: 247) Dr. Sorensen could not determine whether plaintiff's arthritis was complicated by a tear of the meniscus [17] on April 24, 1982. (Tr: 247)

---

14. She was referred to the Institute by the Wisconsin Division of Vocational Rehabilitation to establish the feasibility of formal training and the need for adult education. It is not clear how the Division of Vocational Rehabilitation became involved in plaintiff's case. (Tr: 134)

15. Plaintiff had applied for benefits on June 28, 1982. (Tr: 56–59, 60–69)

16. Bony crepitus is the cracking sound produced when a broken bone or an arthritic joint is moved. *Schmidt's* at C–309.

17. See note 9, *supra.*

Plaintiff went to Luther Hospital for an arthrogram [18] on August 31, 1982. (Tr: 127, 247) On September 2, 1982, Dr. Sorensen saw plaintiff and reviewed the arthrogram. (Tr: 247) It showed the possibility of a very slight tear in the midpoint of the meniscus. (Tr: 247) Plaintiff said her knee felt better after the arthrogram and little excess fluid was noted. (Tr: 247) Dr. Sorensen injected plaintiff with Hydeltra T.B.A.[19] and had her return in a week. (Tr: 247)

On September 14, 1982, Dr. Sorensen again saw plaintiff. He noted that she had an allergic reaction to the cortisone. (Tr: 248) She had less pain but still could not function without crutches because the knee buckled up on her. (Tr: 248) The medial joint line was tender. (Tr: 248)

Dr. Sorensen again followed up on plaintiff on October 5, 1982. She was unimproved. Dr. Sorensen noted that plaintiff had been on Motrin. He told her to take Feldene instead.[20] (Tr: 248)

On October 19, 1982, Dr. Sorensen noted that the Feldene improved plaintiff's condition. However, Dr. Sorensen opined that he did not think removal of the meniscus would improve the knee. (Tr: 248)

On November 16, 1982, plaintiff complained of pain in her right ankle. Dr. Sorensen noted no injury but noted swelling and tenderness. Her knee was unimproved. (Tr: 248)

On Dr. Sorensen's referral, plaintiff was examined by Dr. Timothy Shelley on December 7, 1982.[21] Dr. Shelley noted plaintiff's history of arthritis of the spine.[22] (Tr: 248) Dr. Shelley now noted that the Feldene had not helped her knee. (Tr: 248) He noted that she took Tylenol with codeine and Darvocet, which helped her

pain.[23] Plaintiff complained of problems in her left ankle and right knee and ankle as well as her left knee. (Tr: 248) Dr. Shelley noted that plaintiff was completely dependent on crutches, had difficulty moving around and had pain at night. (Tr: 248) She had occasional stiffness in her hands and shoulders but this was minor in comparison to her legs. (Tr: 248)

On examination, Dr. Shelley noted no problems in the hands, shoulders or cervical spine. He did note decreased range of motion and some discomfort in the lumbosacral spine. (Tr: 249) Upon completing the examination of her legs, Dr. Shelley opined that although she was young for it, plaintiff had degenerative joint disease. (Tr: 249) He speculated that it started in the left knee and spread to the right as a result of favoring the left. (Tr: 299) He called for a full evaluation of plaintiff's arthritis, including that of the spinal region. (Tr: 249) Plaintiff was placed on Indocin, a stronger non-steroid, anti-inflammatory medicine than she had been taking. (Tr: 249) She could continue taking Darvocet for severe pain. (Tr: 249)

Dr. Shelley saw plaintiff on January 20, 1983, for a follow-up examination. He noted that plaintiff had discontinued the Indocin because her digestive tract could not tolerate it. As a result, she was taking no medication at the time. She was still on crutches and showed no new symptoms. (Tr: 249)

On examination, Dr. Shelley noted no muscle spasms, good motion of the spine but with pain, good motion of the hips without pain. She could flex her left knee to 140° but with a small flexion contrac-

---

18. An arthrogram is a joint x-ray usually accompanied by the introduction of an agent into the joint which produces contrast in the x-ray. *Stedman's* at 125.

19. Hydeltra T.B.A. is a type of cortisone, a steroid used, *e.g.* in the treatment of arthritis. (Tr: 248) *PDR* at 1183.

20. Feldene is a non-steroid used for the treatment of symptoms of osteo- or rheumatoid arthritis. *PDR* at 1419.

21. Dr. Shelley's qualifications are not part of the record. (Tr: 131)

22. He was apparently referring to plaintiff's back problems of 1978, described, *supra* p. 1286. Plaintiff's difficulties of 1982, up to this point, had apparently not involved her back.

23. Darvocet is a prescription pain reliever. *PDR* at 1042.

ture.[24] There was some bony overgrowth and escaped fluid. The right knee had crepitus but no fluid and good motion. The left ankle was irritable but had a normal range of motion. The right ankle was only slightly tender. She weighed 243 pounds.

X–rays indicated degenerative disease with medial compartment narrowing bilaterally and some genu varus [25] deformity. There is also some spurring of the patella,[26] most obvious on the right. The L–S spine shows degenerative arthritic changes in the lumbar area. The ankles again showed some degenerative arthritis and spurring along the calcaneus. (Tr: 249) Dr. Shelley opined that plaintiff had definite evidence of arthritis and was quite debilitated by it. (Tr: 249) He was unsure of the cause of her muscle pain and ordered more tests. He prescribed Soma, a muscle relaxant, to ease plaintiff's discomfort. (Tr: 249) He also prescribed Naprosyn [27] as a new anti-inflammatory agent. (Tr: 250)

On February 4, 1983, plaintiff was again examined by Dr. Shelley. (Tr: 250) Plaintiff stated that she was walking across the kitchen floor without crutches when her left knee suddenly gave out, causing her to fall and land on it. The knee became very painful (much more than usual) and swelled. Dr. Shelley noted that motion in the knee decreased. (Tr: 250) He drained the fluid from her knee. X–rays noted very slight joint space narrowing and also degenerative spurring but no fracture. (Tr: 240, 250) He opined that the fall re-injured her knee and aggravated her arthritis. (Tr: 250) Plaintiff was told to continue on crutches and not change medications. (Tr: 250)

Plaintiff reported to the emergency room of Luther Hospital on February 19, 1983. She complained of pain and swelling in the left knee. She was given a prescription for Tylenol # 3 (with codeine) and advised to stay off her feet. (Tr: 126, 251)

Plaintiff was seen by Dr. Shelley in a follow-up on February 25, 1983. (Tr: 251) The swelling and pain continued. The examination noted moderate swelling of the left knee with irritability and decreased mobility. The knee was drained. Plaintiff rejected the use of steroids which had previously caused an adverse reaction. She was continued on Naprosyn and placed on Dyazide.[28] Plaintiff was also given a prescription for Canadian crutches.[29]

March 11, 1983, saw another visit by plaintiff to Dr. Shelley. She felt the swelling had decreased, as did the pain, though she was still bothered. (Tr: 251) Her arthritis in the knees, ankles and lower back was unchanged. She continued to use crutches. (Tr: 251) Dr. Shelley noted some fluid but not much. (Tr: 252) There was irritability and instability but overall, plaintiff had improved. (Tr: 252) However, on April 21, 1983, Dr. Shelley filled out an application for disabled license plates for plaintiff. (Tr: 252)

Plaintiff testified at the April 22, 1983, hearing before Administrative Law Judge Goustin. (Tr: 21) She testified that she weighed 250 pounds at the time-up from 225 in the last year. (Tr: 28) She was gaining weight despite her diet. (Tr: 29)

Plaintiff testified that her back and leg pain prevented her from doing much. (Tr: 39) She could not shop or climb stairs. (Tr: 40) She needed help getting in and out of the bathtub. (Tr: 45) She could dust furniture, operate the dishwasher and fold clothes while sitting. (Tr: 47) She could drive a car up to 100 miles but needed to make four stops to do it. (Tr: 40) Back and leg pain prevented her from

---

24. Contracture is a condition of high resistance to passive muscle stretching. Morton, *Medical Proof of Social Security Disability* (1983) (Morton) at 435.

25. Bowed legs. *Stredman's* at 582.

26. Knee cap. Morton at 433.

27. Naprosyn is a prescription only drug used for relief of mild to moderate pain and treatment of arthritis. *PDR* at 1986. Drug Info.

28. Dyazide is used in the control of excess fluids. *PDR* at 1713.

29. Canadiuan crutches have hand bars to take the weight off the armpit. *Schmidt's* at C–21, H–13.

sleeping more than two hours at night. (Tr: 41)

Plaintiff testified that she helped out her friends by answering the phone at their service garage. (Tr: 38) She could do this for up to three hours. She did it while lying in bed with the phone beside her. (Tr: 38)

She testified that she could only stand up to a half hour with crutches. (Tr: 48) She could walk a half block with crutches but only ten feet without them. (Tr: 44–45) She testified that her ability to sit was limited. As a result she could not take vocational rehabilitation courses. (Tr: 35) When she could sit, it would only be in a hard chair because she could not get out of a soft or low chair. (Tr: 46) She testified that her arms were strong but her back and legs could not handle lifting. (Tr: 46) She could not lift a 10–pound sack of flour. (Tr: 46)

The record next indicates that plaintiff saw Dr. Shelley again on June 17, 1983. (Tr: 252) She weighed 250 pounds. (Tr: 252) Dr. Shelley told plaintiff about his concern that when arthritic people use wheelchairs they become dependent on them. She said that she would like to try one for a month and would not be able to use it in her house. He gave her a prescription to use it for a month and also increased her dosage of Naprosyn. (Tr: 252)

Dr. Shelley examined plaintiff again on July 22, 1983. (Tr: 253) Although plaintiff's arthritis was stable, he suggested that it had spread to her neck. He was also concerned about numbness in her upper right arm. (Tr: 253) She was given permission to use the wheelchair at home and referred to a Dr. Finkel for examination of the numbness. (Tr: 253) [30]

Dr. Finkel (who is not otherwise identified on the record) saw plaintiff on August 8, 1983. He noted that by this time plaintiff could no longer get around even on crutches. Her hand now bothered her severely and she could not grip properly. (Tr: 253) She was depressed because of her pain, inability to move around and lack of financial resources. She was diagnosed as being obese, having multiple joint pains due to arthritis, right arm discomfort and depression exacerbated by pain. He prescribed Pamelor, an anti-depressant. (Tr: 254) Spinal x-rays taken that day indicated mild arthritic and hypertrophic changes in the spine and limitation of flexion mobility. (Tr: 241)

Dr. Shelley drained her knee on August 25, 1983. Plaintiff indicated that the Pamelor helped her pain as much as anything else. Dr. Shelley also reported that plaintiff had seen an orthopedist who felt that her ankles needed no special treatment. Her medications were continued and her next appointment scheduled. (Tr: 254)

The medical record over the next two and one-half years is incomplete.[31] In a September 7, 1983, letter to plaintiff's counsel, Dr. Blink described the history of plaintiff's weight problem. He noted that an important factor in plaintiff's inability to lose weight was her difficulty in getting around which resulted in fewer than the average number of calories expended. (Tr: 242)

Since the July 1982 vocational rehabilitation evaluation, plaintiff had not been actively involved in the program because of her arthritic condition. Her counselor, Ken Bridell reported on October 6, 1983, that he had seen plaintiff in town during the summer. Given plaintiff's condition he questioned the feasibility of continuing to work with her but wanted to keep her case open in the event her condition stabilized. (Tr:

---

**30.** Defendant ultimately found that plaintiff became disabled due to obesity at approximately this time on August 1, 1983. Apparently the disability threshold was crossed when plaintiff's weight first exceeded 266 pounds and so, when considered with her arthritis, she had a listed obesity impairment. (Tr: 173, 174) The finding of disability as of, and following, this date is

not disputed. As previously noted, plaintiff's SSD insured status expired on March 31, 1983.

**31.** However, it must again be noted that defendant has found plaintiff to be disabled as of, and subsequent to, August 1, 1983. (Tr: 156) Defendant is bound by this finding. 20 CFR §§ 404.981, 416.1481.

305) By November 1, 1983, Bridell was convinced that plaintiff would not improve. (Tr: 304) Bridell's November 28, 1983, report indicated that plaintiff's rehabilitation program was declared "Closed not Rehabilitated." Bridell noted that plaintiff's condition had become so severe that vocational rehabilitation was no longer feasible. (Tr: 302) The record next indicates that in June 1984, Bridell reported seeing plaintiff around town several times in the past six months and noted that her condition had not improved. (Tr: 303)

The record presents a gap up to November 13, 1984, when plaintiff was examined by Dr. S.J. Monson, an optometrist, on referral from Sheila Morden, who is not otherwise identified. (Tr: 255–256) His report, submitted by plaintiff, recommended glasses. However, Dr. Monson doubted the glasses would alleviate her vision difficulties because of neck spurs [32] pinching the nerves leading to the eye. (Tr: 255)

The next report on the record indicates that plaintiff had a series of x-rays taken at Luther Hospital on March 21, 1985. (Tr: 262–263) At the time her family doctors were Drs. B.R. Bonte and P.W. Connerly. (Tr: 262) X-rays of the spine indicated "[m]ild diffuse degenerative changes" in several places. Degenerative arthritic changes were noted in both feet, ankles and knees. (Tr: 262–263) [33]

After this case had been remanded for further proceedings by this court,[34] Administrative Law Judge D'Amico conducted a hearing on April 4, 1985. (Tr: 198) He noted for the record that plaintiff used arm crutches to ambulate. (Tr: 204) Plaintiff briefly testified as to the progress of her condition. At the time she had arthritis in the spine, neck, feet, ankles, wrists, elbows and knees. (Tr: 204) The arthritis also affected her vision. (Tr: 205) She continued to take Naporsyn, Darvocet, Tylenol with codeine, Dyazide and also took an anti-depressant and an anti-infectant. (Tr: 205) At the close of the hearing the Administrative Law Judge told plaintiff that he would afford her benefits. (Tr: 205)

On April 26, 1985, the Administrative Law Judge found that plaintiff's arthritis was a listed impairment at Step 3, and found her disabled as of April 24, 1982. (Tr: 339–340) The Appeals Council remanded the decision on October 31, 1985, because of the Administrative Law Judge's failure to obtain the medical opinion of a physician appointed by defendant as required by the regulations. (Tr: 193) The Administrative Law Judge was directed to take further testimony and also conduct a supplemental hearing with a medical advisor to assist him in establishing claimant's maximum work capability. (Tr: 194) [35]

Dr. Stephanie Jakim examined plaintiff at defendant's request on December 9, 1985. Plaintiff complained that her whole body hurt continuously and Dr. Jakim remarked that she was able to be very specif-

---

**32.** A spur is a small pointed outgrowth of bone. *Schmidt's* at S–157.

**33.** The record also presents a series of indiscernible notes and records apparently related to a heart condition in February, 1985. (Tr: 265–269)

**34.** As noted, *supra* p. 1285, Administrative Law Judge Goustin's decision denying plaintiff's application was rendered on July 21, 1983. (Tr: 6–13) It was affirmed without comment by the Appeals Council on September 26, 1983 (Tr: 37) but remanded by Judge Crabb on December 18, 1984. (Dkt. ## 10, 11)

**35.** Specifically the Appeals Council instructed the Administrative Law Judge to have a physician designated by the Secretary consider whether plaintiff had a listed impairment, pursuant to 20 CFR §§ 404.1526(b) and 416.926(b). In addition, the Administrative Law Judge was instructed to take updated medical evidence regarding plaintiff's ability to perform work and to conduct a hearing with a medical advisor present to assist him. The Administrative Law Judge was further instructed to make specific findings as to the credibility of plaintiff's complaints of pain. (Tr: 193–194)

The Administrative Law Judge received the medical interrogatory of Dr. Jakim, a physician appointed by defendant, which was based on Dr. Jakim's own examination of plaintiff. There was no hearing at which a medical advisor was present and the Administrative Law Judge's subsequent February 7, 1986, opinion did not specifically address the issue of plaintiff's credibility, although, because the decision was fully favorable to plaintiff, it is clearly implied that her credibility was not questioned. (Tr: 342–346)

ic about her complaints. (Tr: 270) Plaintiff indicated that the pain increased gradually over the past two years, becoming quite bad in the past year. She reported being unable to do housework or even put on her own shoes and socks for at least 2½ years. She used crutches and reported using a wheelchair for a brief period. Plaintiff had discontinued the use of nonsteroidal anti-inflammatories, Naprosyn, Dyazide and muscle relaxants in the past month because she had no income since May. This increased her pain. (Tr: 270–271)

Plaintiff weighed 270 pounds and was described as obese. She moved slowly with much difficulty. (Tr: 271)[36] Dr. Jakim commented that plaintiff lacked 10 degrees in extension of her left knee. She noted slight enlargement of the knees but without significant swelling. No instability or deformity was noted in any joint. (Tr: 271–272) Strength testing revealed no spasm or atrophy but she had trouble standing, walking and squatting. She was able to lift and carry an eight-pound textbook but walked with difficulty. Dr. Jakim's impression was that plaintiff had

(1) Degenerative joint disease involving her spine, knees and ankles. (2) Marked obesity which is obviously aggravating No. 1.

(Tr: 272)

On January 6, 1986, Dr. Jakim completed a medical interrogatory at defendant's request based on the December 9, 1985, exam. (Tr: 276) Dr. Jakim stated that she was familiar with the descriptions of listed impairments in the regulations.[37] Dr. Jakim stated that plaintiff suffered from degenerative joint disease of the knees and ankles but that this did not meet any listed impairment. (Tr: 276) Her responses to the interrogatory make no mention of plaintiff's obesity[38] (Tr: 276), despite her prior notation that plaintiff weighed 270 pounds. (Tr: 271) She responded that

plaintiff's impairments in combination or singly did not meet the requirements of the regulation listings in general and the arthritis listings in particular. (Tr: 276)

Dr. Jakim also completed a physical abilities assessment form on January 8, 1986. She noted that plaintiff could lift up to 8 pounds but could not move around with any excess weight. She was unable to determine whether plaintiff could lift anything on a frequent or occasional basis. (Tr: 274) Plaintiff's ability to stand and walk was impaired in that she used crutches. Dr. Jakim could not determine how much plaintiff could stand or walk in an eight-hour day. (Tr: 274) She noted that plaintiff sat for 30 minutes without difficulty and noted that her sitting was unimpaired but was unable to determine her ability to sit over the course of an eight-hour day. Dr. Jakim further noted that plaintiff could never climb, stoop, crouch, kneel or crawl. Her pushing/pulling and seeing were impaired as were her ability to work around heights and moving machinery. (Tr: 274–275)

Dr. Jakim concluded the report by stating that:

In fairness to this patient, I would recommend testing by an occupational work tolerance program. (such as Health [illegible] at Luther Hospital). I have provided an accurate physical exam but to extrapolate to this form is grossly inadequate.

(Tr: 275)

Plaintiff reported that she had a stroke which hospitalized her from January 16 to January 24, 1986. (Tr: 280) The records of the hospitalization and subsequent treatment are not on the record.

On February 7, 1986, without a further hearing, the Administrative Law Judge found that plaintiff had been disabled since

---

**36.** Dr. Jakim noted that plaintiff was tearful throughout the examination. By contrast, on July 21, 1982, her vocational counselor described her as "friendly, warm and garrulous." (Tr: 134)

**37.** However, only the arthritis impairment regulations were attached to the interrogatory. The

obesity impairment regulations were not supplied. (Tr: 277)

**38.** Dr. Jakim also made no note of the arthritis in plaintiff's spine even though her own examination revealed that plaintiff did have degenerative joint disease of the spine. (Tr: 272)

April 24, 1982, because she could not perform sedentary work. (Tr: 345–346) He based this finding on Dr. Jakim's physical ability assessment. (Tr: 345) No finding on listed impairments was made.

On April 2, 1986, the Appeals Council again remanded the case. It noted that the Administrative Law Judge did not state the regulatory basis for his decision. (Tr: 186) It also noted that he did not conduct a hearing and take medical testimony as directed by the Council in its October 31, 1985, decision. (Tr: 186) The Appeals Council then conducted a *de novo* evaluation of Dr. Jakim's evidence only and concluded that plaintiff could perform a wide range of sedentary work. (Tr: 187) The Council, noting Dr. Jakim's report that plaintiff weighed 270 pounds, concluded that plaintiff had a listed obesity impairment but only after December 9, 1985 (the date of Dr. Jakim's exam). (Tr: 187) The case was again remanded for the consideration of psychiatric evidence, specific findings as to the credibility of plaintiff's subjective complaints and a determination of disability prior to December 9, 1985. (Tr: 188–189) [39]

At defendant's request, Conrad V. Christensen, a licensed psychologist, conducted a mental evaluation of plaintiff on May 28, 1986. (Tr: 281) Plaintiff reported that the right side of her body was asleep from the stroke. (Tr: 281) She recounted a history of depression but had not been treated for it recently. (Tr: 282)

Plaintiff was pleasant and cooperative during the evaluation. (Tr: 282) Her weight was up to 290 pounds. (Tr: 283) She was described as "a reliable informant." (Tr: 283) She was resentful of the way the government treated her and admitted hostility and bitterness. (Tr: 283) He described her response to her past experiences with the government and with life in general as appropriate but angry. (Tr: 284) Christensen diagnosed her as having major affective depression with anxiety which required continued treatment. (Tr: 284)

Christensen prepared a Medical Assessment of Ability to [sic] Work–Related Activities (Mental). (Tr: 285–286) He noted that plaintiff could not function independently and noted that, physically, she walked with wrist canes and limped substantially. (Tr: 285) He further noted that in addition to her depression, plaintiff would be limited in performing any task requiring physical input. (Tr: 286)

On June 10, 1986, Dr. Joseph Brown, at defendant's request, prepared a psychiatric review apparently based on Christiansen's psychological evaluations. (Tr: 287–299) Dr. Brown found that plaintiff had a severe mental impairment (affective depression and anxiety) but not a listed impairment. (Tr: 287, 290) He also found that plaintiff was mentally capable of unskilled work. (Tr: 298)

On July 21, 1986, Dr. Irma Bland, a non-examining physician, filled out a Medical Interrogatory, at defendant's request.[40] She noted plaintiff had severe depression with anxiety; degenerative joint disease of the spine, knees, ankles and feet and obesity. She noted that the medical record was deficient because:

> Orthopedic exams indicate physical examinations and x-rays of moderate to severe progressive degenerative joint dis-

---

**39.** The Appeals Council noted the Administrative Law Judge's failure to conduct a supplementary hearing. (Tr: 186) It did not challenge his implied determination that plaintiff was credible. The Administrative Law Judge was instructed to obtain a psychiatric evaluation of plaintiff's mental impairment. He was also instructed to take updated testimony from her. He was further asked to take testimony from a medical advisor to assess plaintiff's disability and to assess her compliance with diet recommendations. The Administrative Law Judge was again requested to make specific findings on plaintiff's credibility. (Tr: 184)

The Administrative Law Judge received Christensen's psychological evaluation report. (Tr: 281) He received a medical interrogatory rather than testimony from Dr. Bland. (Tr: 300–301) A hearing was held in which plaintiff testified. (Tr: 207) Again no specific findings on credibility were made, although the Administrative Law Judge stated at the hearing that he believed her testimony. (Tr: 212)

**40.** The record does not include a record of either Dr. Bland's instructions or a description of the evidence she considered.

ease but fail to elucidate whether same is consistent w/ degree of functional impairment.

(Tr: 300) She also complained that the psychiatric evidence was necessary to determine whether plaintiff had a somatization disorder.[41] (Tr: 300) The interrogatory requested her opinion as to whether plaintiff had a listed impairment. She replied negatively citing the deficiencies in the record noted above. (Tr: 300) She also responded that she was also unable to assess plaintiff's mental disfunction and arthritis, and their resulting limitations as a result of insufficient evidence. (Tr: 301) She did note that plaintiff appeared to comply with her medical advice and medications. (Tr: 301)

On September 10, 1986, another hearing was held. (Tr: 207) The Administrative Law Judge made the following comments prior to the testimony.

I heard the case once before and I believe [sic] her then and I haven't changed my mind based upon the medical evidence so with respect to her credibility, I'm going to come down on her side. I really don't sse [sic] what that lfeaves [sic] us with today but Counsellor I will give you the opportunity to make any kind of record that you can. And my opinion is not going to change. I still believe that she is disabled from April 24th of 1982. However, my opinion is only recommended. The ultimate decision in this case rests with the Appeals Council.

(Tr: 212)

Plaintiff testified to her condition specifically as it related back to the period before August 1, 1983. Much of her testimony repeated that she gave at the April 22, 1983, hearing.

Plaintiff testified that her weight first exceeded 266 pounds in about August 1983. (Tr: 225)[42] She described herself as being in pain 24 hours a day since 1982. (Tr: 218) The pain was in her whole body though back in 1982 the legs suffered most. (Tr: 218) She described her leg as having a constant shooting pain which she had learned to live with. (Tr: 219) She testified that back pain started in 1978 when her back went out on her. (Tr: 219–22) The pain was described as being like somebody kicked her. (Tr: 220) The pain continued and at the time of testimony covered her entire back, though in 1982 it was limited to her lower back. (Tr: 220) By 1982 the pain existed most of the time. (Tr: 221) She stated that she could have lived with the back pain if her knees had not gone out. (Tr: 221) She testified that she had taken pain killers continuously, at least since 1982. (Tr: 221) These and other medications included Flexeril, Cortisone, Carisopridol,[43] Naprosyn and ten or eleven different arthritic medications. (Tr: 232)

She testified that she had done no housework since 1982. She did no cooking, ironing, dish washing, vacuuming, lawn and gardening, dusting, mopping, laundry or shopping. (Tr: 231, 233–234) She could not make her own bed and needed assistance dressing. (Tr: 234–235)

She testified that she has not been able to sit for any length of time since April 1982. (Tr: 226) She could sit in the same chair without moving for about 30 minutes. (Tr: 226) She could not sleep more than two hours at a time because she got cramped. (Tr: 227) She could lift up to ten pounds. (Tr: 228) But she could not lift anything on a repeated basis. (Tr: 227–228) She could not carry anything because of her crutches. (Tr: 228) She

---

**41.** Somatization is the conversion of anxiety into physical symptoms. *Stedman's* at 1301.

**42.** When plaintiff so testified the Administrative Law Judge stated:

Counsellor if you are prepared to amend the application to August of 1983, I'll recommend a favorable decision based upon this from [section] 10–10 [sic]. But I just don't [think] that there is—unless you can work it

out on some other basis but you can see where the Appeals Council is headed here because they disallowed that question indicating that there is no record that she had the listing prior to the time that her weight exceeded 266.

(Tr: 225–226)

**43.** Carisopridol is a muscle relaxant. *Stedman's* at 830.

could stand up to 10 minutes without crutches. (Tr: 225)

The Administrative Law Judge made his recommendation on January 9, 1987. (Tr: 169–174) His consideration of the evidence included a discussion of Christensen's psychological evaluation. (Tr: 172) Dr. Bland's medical interrogatory (to the extent that it indicated plaintiff had severe impairments and complied with her medical advice she received) (Tr: 173), Bridell's November, 1983, report discontinuing plaintiff's vocational rehabilitation program (Tr: 174), and Dr. Jakim's December, 1985, examination (though not her medical interrogatory and residual functional capacity assessment). (Tr: 174)

The decision included no discussion of the medical record prior to August 1, 1983, and no discussion of plaintiff's testimony except to credit plaintiff's statement that her weight first exceeded 266 pounds in August 1983. The Administrative Law Judge found that plaintiff had a listed obesity impairment as of August 1, 1983. The decision included the following findings:

1. The claimant met the disability insured status requirements of the Act on April 24, 1982, the date the claimant stated she became unable to work, and continues to meet them through march [sic] 31, 1983 but not thereafter.

2. The claimant has not engaged in substantial gainful activity since April 24, 1982.

3. The medical evidence establishes that the claimant has severe obesity, depression with anxiety, progressive degenerative joint disease of the spine, knees, ankles and feet.

4. The severity of the claimant's impairments meets the requirements of section 10.10 A, Appendix 1, Subpart P, Regulations No. 4 and has precluded her from working for at least 12 continuous months (20 CFR 404.1525 and 416.925).

5. The claimant has been under a "disability," as defined in the Social Security Act, since August 1, 1983 (20 CFR 404.1520(d) and 416.920(d)).

(Tr: 174) As a result of these findings, the Administrative Law Judge concluded that plaintiff was not entitled to SSD benefits because she became disabled after her insured status expired. She was entitled to SSI benefits as of August 1, 1983. (Tr: 175) The Administrative Law Judge made no findings as to plaintiff's credibility or her ability to perform work, at Step 5, for the period prior to August 1, 1983.

The Appeals Council affirmed the Administrative Law Judge's decision with modifications on June 26, 1987. It commented that a finding of disability is not made on the basis of diagnoses but on findings supporting specific elements of the listing. (Tr: 155) It further noted that weight must be given to the individual's subjective complaints to the extent they were supported by the evidence as a whole. The Council then discussed the evidence as follows:

The Council concludes that the evidence of record is consistent in establishing a worsening of the claimant's impairments in August 1983 commensurate with the Administrative Law Judge's finding that the claimant was under a "disability" commencing on August 1, 1983, but not prior thereto. This is evidenced by the clinic notes of August 8, 1983 through August 25, 1983 (Exh. 36, pp. 8 and 9) and the vocational rehabilitation notes of October 6, 1983 through June 18, 1984 (Exh. 48). Prior to August 1, 1983, the record reveals findings reasonably commensurate with the capacity to perform sedentary work. This is evidenced by the vocational rehabilitation report of July 1982 (Exh. 26), the clinic notes of March 11, 1983 (Tr: 121), the X–ray evidence of February 1983 (Exh. 32), and the clinic notes of April 21, 1983 through July 22, 1983 (Exh. 36, pp. 7 and 8). In reaching the conclusion that the claimant had the capacity for sedentary work for the period from April 24, 1982 through July 31, 1983, the Council has carefully considered the claimant's subjective complaints of pain; but, pursuant to sections 404.1529 and 416.929 of Social Security Administration Regulations

Nos. 4 and 16 and the adjudicatory guidance in Social Security Ruling 82–58, concludes that the evidence does not show, for the period in question, impairments reasonably capable of producing the degree of limitations and pain alleged. (Tr: 155–156) The Council also found that plaintiff's mental impairment was not severe. The Appeals Council modified the Administrative Law Judge's finding of fact number 4 to read:

4. As of August 1, 1983, the severity of the claimant's impairments meets the requirements of section 10.10A, Appendix 1, Subpart P, Regulations No. 4 and has precluded her from working for at least 12 continuous months (20 CFR 404.1525 and 416.925)

5. Prior to August 1, 1983, the claimant's impairments did not meet or equal the requisite level of severity of the listing of impairments and she had the capacity to perform sedentary work with her occupational base not significantly reduced by the limitations stemming from pain and from her mental impairment.

6. Prior to August 1, 1983, the claimant was unable to perform her past relevant work as a waitress and a cook in that the demands of this work are in excess of her capacity for sedentary work.

7. If the claimant had the capacity to perform the full range of sedentary work, sections 404.1569 and 416.969 of Social Security Administration Regulations Nos. 4 and 16 and Rule 201.25 would direct a conclusion that she is "not disabled." Because the range of sedentary work which the claimant was able to perform prior to August 1, 1983 was further compromised, but not significantly so, by the limitations imposed upon her because of pain and her mental impairment, a finding of "not disabled" is appropriate upon consideration of Rule 201.25 as a "framework" for decisionmaking.

(Tr: 156) As modified, the Appeals Council adopted the Administrative Law Judge's recommendations and that decision became the final decision of defendant. (Tr: 157)

## CONCLUSIONS OF LAW

In reviewing defendant's decision, a court must determine whether the decision is supported by substantial evidence considering the record as a whole. *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir.1982). Substantial evidence is such that " 'a reasonable mind might accept as adequate to support [the] conclusion.' " *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir.1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). If the record contains such evidence defendant's decision must be affirmed unless it contains an error of law. *Garfield*, 732 F.2d at 607.

To determine whether a claimant is disabled:

[t]he following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe?" (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5 to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Garfield*, 732 F.2d at 607 n. 2.

Defendant has determined that plaintiff was disabled as of August 1, 1983, but not before. Since plaintiff's SSD insured status expired four months earlier on March 31, 1983, the effect of defendant's decision is to deny any SSD benefits and afford only SSI benefits, and those benefits only after August 1, 1983.

Plaintiff contends that defendant's determinations of plaintiff's condition prior to August 1, 1983, at Step 3 (that plaintiff did not meet or exceed a listed impairment) and at Step 5 (that plaintiff could perform work available to her) are not supported by substantial evidence.

Before considering the merits of her arguments it may be helpful briefly to review the tortuous six-year-long course of plaintiff's claim:

(1) June 28, 1982—Plaintiff's first application for SSD and SSI benefits for disability alleged to have onset on April 24, 1982. (Tr: 56, 60)

(2) July 21, 1983—Administrative Law Judge Goustin finds plaintiff not disabled and denies her benefits after an April 22, 1983, hearing. (Tr: 6–13)

(3) September 26, 1983—Appeals Council Affirms Administrative Law Judge Goustin's decision without comment. (Tr: 3)

(4) December 18, 1984—This court remands case as neither material, new evidence before the Appeals Council, nor any findings with respect thereto, have been included in the record. (Dkt. # 3)

(5) April 26, 1985—After an April 1, 1985, hearing Administrative Law Judge D'Amico recommends that plaintiff be found disabled since April 24, 1982, due to a Step 3 arthritis impairment. (Tr: 336–30)

(6) October 31, 1985—Appeals Council remands case due to absence of proper medical proof (opinion of physician designated by defendant) at Step 3 and for receipt of evidence at Step 5 and specific findings regarding plaintiff's credibility. (Tr: 193–194)

(7) February 7, 1986—Recommended decision of Administrative Law Judge D'Amico fully favorable to plaintiff who is found disabled at Step 5 since April 24, 1982. (Tr: 342–346)

(8) April 2, 1986—Appeals Council finds Step 3 obesity disability as of December 9, 1985, but again remands the case for additional evidence and more detailed recommended findings and decision. (Tr: 186–189)

(9) January 9, 1987—Recommended decision after third hearing (September 10, 1986) by Administrative Law Judge

D'Amico—plaintiff found disabled at Step 3 (obesity impairment) as of August 1, 1983. Plaintiff's credibility not challenged. (Tr: 169–174)

(10) June 26, 1987—Appeals Council adopts recommendation after amending findings to state specifically that the disability as of August 1, 1983, was due to a Step 3 obesity impairment; that prior to August 1, 1983, plaintiff's impairments were not disabling at Step 3 and that plaintiff could perform sedentary work not significantly compromised by her pain (the subjective complaints of which were not supported by the evidence) and mental impairment. (Tr: 155–157)

### A. *Step 5 Determination*

█ Because of the recommended disposition of this case, defendant's Step 5 determination will be discussed first. The plaintiff contends that defendant improperly used the medical-vocational guidelines, 20 CFR § 404, Subpt. P, App. 2 (the grid) in finding plaintiff not disabled. She argues that substantial evidence could not support a finding that plaintiff had the capacity to perform sedentary work. She also argues that defendant improperly discredited her testimony concerning pain.

When, as here, defendant finds at Step 4 that a claimant cannot return to her past employment, the burden shifts to defendant to prove that the claimant can perform other work. *Lauer v. Bowen,* 818 F.2d 636, 638 (7th Cir.1987). Defendant's first step in meeting that burden is to determine what work the claimant is capable of performing. In this case, the Appeals Council found (albeit ambiguously) that prior to August 1, 1983, plaintiff had the exertional capacity to perform the full range of sedentary work which was not significantly compromised by her non-exertional limitations caused by pain and mental impairment. (Finding of Fact # 7, Tr: 156) [44] Sedentary work is defined in the regulations:

---

**44.** The Administrative Law Judge made no Step 5 findings. The Appeals Council stated that "the record reveals Findings reasonably commensurate with the capacity to perform sedentary

work." (Tr: 155) It found that "if" plaintiff could perform sedentary work, § 201.25 of the grid would direct a finding of disabled and that because plaintiff's pain and mental impairment

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 CFR §§ 404.1567(a), 416.967(a).

In determining plaintiff's exertional capacity to perform sedentary work prior to August 1, 1983, the Appeals Council, without elaboration, relied on the 1982 through 1984 vocational rehabilitation reports prepared under the supervision of plaintiff's vocational counselor, Ken Bridell. The Appeals Council also cited, without elaboration, Dr. Shelley's notes from February 1983 through August 1983 (Tr: 240–253) (including a radiologist's report of February 4, 1983, X–rays prepared at his request) (Tr: 250), and Dr. Finkel's August 1983 notes. (Tr: 253–254)

The Council's findings appear to be primarily dependent upon isolated uses of the word "sedentary" in the July 21, 1982, vocational rehabilitation evaluation without regard to the overall context of the report. The report indicates that plaintiff's work needs were: "Job that is sedentary requiring very little walking, lifting or carrying." (Tr: 132) In assessing plaintiff's physical work capacity the reporter checked off a box indicating plaintiff could perform: "sedentary work (lift max of 10 lbs; mostly sitting.)" (Tr: 148) The evaluation appears to use the word "sedentary" in its adjectival sense and not as a term of art as defined in the Secretary's regulations. It is not apparent that the preparation of the evaluation was in any way connected with plaintiff's application for Social Security Benefits or that the evaluators intended to use the term in its regulatory sense.

An examination of the July 1982 vocational rehabilitation report (and counselor Bridell's follow-ups in 1983 and 1984) in the light of the Secretary's own regulation and explanation reveals that it cannot support a finding that plaintiff could perform sedentary work. For example, the regulation requires claimants to be able to lift up to 10 pounds and occasionally lift or carry smaller items like files, ledgers or small tools. 20 CFR §§ 404.1567(a), 416.967(a). The vocational rehabilitation report did indicate that plaintiff could indeed lift a maximum of ten pounds (Tr: 148), but that alone is not enough; claimant must be able to lift and carry "occasionally." Defendant has explained this:

"Occasionally" [as used in the regulation] means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83–10 at 179.

Plaintiff was, of course, on crutches at the time and continued to be on crutches without interruption to the present. Obviously, a person on crutches is going to have difficulty carrying things, and the vocational report specifically noted that plaintiff needed work "requiring *very little* ... lifting or carrying." (Tr: 132) [emphasis added] "Very little" cannot reasonably mean up to two hours or more in an eight-hour day and there is nothing in the report or elsewhere in the record to support the conclusion that plaintiff could do it. Indeed, the evaluation contradicts it.

Similarly, the evaluation tends to show that plaintiff cannot satisfy the category's

did not significantly affect the range of sedentary work she could perform, use of § 201.25 as a "framework for decisionmaking" led to a finding of not disabled. (Finding of Fact # 7, Tr: 156) Although this statement is cumbersome, it must be assumed that plaintiff was found able to perform the full range of sedentary work because the Appeals Council did not describe any limitation on the ability to perform such work.

occasional standing and walking requirements. The evaluation indicates that plaintiff requires a work setting with "very little walking...." (Tr: 132) It noted that she ambulated with difficulty, using crutches throughout the evaluation. (Tr: 132, 134, 135–136) .The possibility of placing plaintiff in a wheelchair was also considered. (Tr: 136) The report indicates repeatedly that her lack of mobility was a serious vocational limitation. (Tr: 132, 134, 135, 136, 137) It is hard to see how an objective reading of the report could yield a finding that she could stand and walk up to two hours in an eight-hour day as contemplated in defendant's own definition of the full range of sedentary work.

The sedentary work regulation also requires the ability to sit most of the day— approximately six hours. Some support for the capacity to sit is found in the box indicating that plaintiff was capable of: "sedentary work (lift max. of 10 lbs; mostly sitting)" (Tr: 148), but nothing in the vocational rehabilitation evaluation quantifies the amount of time plaintiff was able to sit in an eight-hour day. However,

> [i]t was noted throughout the evaluation that at the end of each day, her work pace would noticably [sic] decrease.
>
> Statements made by Karen included, "I'm getting tired, my body does that" and "My arms are heavy." The demands of the evaluation were sufficient to cause fatigue by the end of each day. This fatigue factor could effect [sic] her chances of success in a training program, and should be taken into consideration.

(Tr: 136) Putting aside plaintiff's inability to stand, walk and carry, this statement also conflicts with the inference that plaintiff could sit and work for an entire 8–hour day.

Subsequent entries in plaintiff's vocational rehabilitation record indicate that plaintiff was not actively involved in the program because her arthritis was too severe to allow her to work. (Tr: 304–305) Ken Bridell made an entry on October 6, 1983,

noting that he had seen and spoke to plaintiff during the summer. She was confined to a wheelchair. (Tr: 305) He kept her file open with the doubtful hopes that her condition would stabilize. By November, 1983, Bridell gave up all hope and closed the file. (Tr: 303, 304) [45]

In summary, the vocational rehabilitation record actually evidences an incapacity to perform sedentary work in July, 1982, and a progressive deterioration thereafter.

The other evidence cited by defendant also offers no support for his position. Defendant's citation to Dr. Shelley's notes lacks the slightest discussion or consideration of content, leaving the reader to search out supportive content. But as I see it, the treatment by Dr. Shelley, as well as his associates, Dr. Sorensen and Dr. Finkel, taken as a whole, confirms plaintiff's inability to perform sedentary work. Their notes, from August 1982 to August 1983, are replete with references to plaintiff's immobility, dependence on crutches and her pain. (Tr: 247–254) [46] The February 4, 1983, x-rays cited by defendant were taken to diagnose plaintiff's further injury of her knee after falling when she tried a simple walk across the kitchen floor without crutches. (Tr: 250) In June 17, 1983, Dr. Shelley reported that plaintiff could not walk more than one-half block even with crutches. (Tr: 252) He hesitated to prescribe wheelchair use because of his apprehension that arthritic people often became dependent on wheelchairs and became unable to ambulate at all. (Tr: 252) Nevertheless, he considered plaintiff's condition to be severe enough to warrant a month's trial with a wheelchair. (Tr: 252) On July 22, 1983, Dr. Shelley noted that plaintiff's attitude improved because she could get around town with her wheelchair and ambulated with crutches at home. However, the improvement was only temporary because by August 8, 1983, Dr. Finkel noted that she could not ambulate at all with crutches. In sum, the doctors' reports do

---

**45.** A follow-up report by Bridell in June 1984, indicated no improvement in plaintiff's condition. (Tr: 303)

**46.** For a discussion of the credibility of plaintiff's subjective complaints of pain, see p. 1301, *infra.*

not show that plaintiff ever became able to do sedentary work, but rather that her immobility and inability to work was present throughout the period of treatment and that her condition, if anything, became progressively worse.

Other record evidence not cited or discussed by defendant similarly contradicts the determination that plaintiff could perform sedentary work from April 24, 1982, to August 1, 1983. Plaintiff was placed on crutches by Dr. Smith when she first injured her knee in April, 1982. (Tr: 101) Her dependence on crutches was noted by Dr. Hicks in July, 1982, and never ceased. (Tr: 108) Even defendant's own examining physician, Dr. Blink, noted, on August 18, 1982, that plaintiff walked with difficulty. (Tr: 111)[47]

It is not necessary to find a claimant to be completely immobilized before disability will be found. Nor is disability defeated by the capacity to work part of the time or to do part of the work.

> If a claimant cannot perform work falling within the definition of sedentary for more than a brief period, the claimant cannot be found not disabled. *Cavitt v. Schweiker,* 704 F.2d 1193, 1195 (10th Cir. 1983). *Cf. Johnson v. Harris,* 612 F.2d 993, 998 (5th Cir.1980) ("[A] physical limitation which prevents a claimant from working a full work day, minus a reasonable time for lunch and breaks, constitutes a disability within the meaning of the Act.").

*Rousey v. Heckler,* 771 F.2d 1065, 1071 (7th Cir.1985). As noted, plaintiff's continued dependence on crutches or a wheelchair throughout the period in question also establish that plaintiff could not perform the standing, walking and carrying components of sedentary work.

> [A] claimant must be able to perform the *full range* of such work on a daily basis in order to be placed in a particular RFC [Residual Functional Capacity] category.

*Channel v. Heckler,* 747 F.2d 577, 579–580 (10th Cir.1984) (emphasis in original).

I conclude that defendant's finding that plaintiff had the exertional capacity to perform sedentary work is not supported by substantial evidence.

*Plaintiff's Credibility*

■ The plaintiff testified as to her constant pain (Tr: 218–221) and limitation on activities caused by her impairments. She testified that she could not stand for more than ten minutes without crutches (Tr: 225) and her ability to walk even with crutches was very limited. She could not sit for prolonged periods of time. (Tr: 35, 226) She could not perform some of the most routine tasks like getting in and out of a bathtub (Tr: 45) and dressing herself. (Tr: 234–235, 270) The Appeals Council stated that it:

> carefully considered the claimant's subjective complaints of pain; but, pursuant to sections 404.1529 and 416.929 of Social Security Administration Regulations

**47.** Although Dr. Jakim's Residual Functional Capacity Assessment was based on a December, 1985, exam and thus does not directly relate to the period at issue, a brief analysis of the report is instructive in revealing the attitude of the Appeals Council toward finding plaintiff disabled. Administrative Law Judge D'Amico's February 7, 1986, recommendation relied on Dr. Jakim's assessment in finding that defendant had not established that plaintiff could perform sedentary work. (Tr: 345) However, on April 2, 1986, the Appeals Council erroneously stated that Jakim's assessment supported a finding that plaintiff could perform a wide range of sedentary work. (Tr: 187) Dr. Jakim's assessment indicated that plaintiff used crutches to ambulate and, though she could lift eight pounds, she could not ambulate with any extra weight. (Tr: 274) The assessment indicated that plaintiff was observed as being able to sit for 30 minutes

without difficulty. However, Dr. Jakim declined to provide any assessment of plaintiff's ability to stand, carry or sit over the course of an eight-hour day, noting that she was unable to extrapolate from her exam to the assessment form. Instead, she recommended testing in a work tolerance program which defendant declined to procure. The Appeals Council clearly erred in finding that Dr. Jakim's 1985 assessment indicated the then current ability to perform work involving eight hours of sitting with occasional walking, lifting or carrying. But beyond that, it ignored the advice of its own physician in failing to take evidence which she felt was necessary to make a valid determination. The seriousness of this error is compounded when it is recalled that it was *defendant's* burden to establish that plaintiff could work. *Lauer,* 818 F.2d at 638.

Nos. 4 and 16 and the adjudicatory guidance in Social Security Ruling 82–58, concludes that the evidence does not show, for the period in question, impairments reasonably capable of producing the degree of limitations and pain alleged. (Tr: 156) I also conclude that the Appeals Council erred in that determination.

The Appeals Council's determination is inadequate in law. Plaintiff's testimony of her own condition is evidence which must be specifically rejected by a credibility determination. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985). The Appeals Council failed to cite or discuss a single piece of evidence to support its finding. Moreover, the Appeals Council's sole premise conflicts with the Secretary's own ruling that the finder of fact must consider more than just the medical evidence to evaluate subjective complaints.

> The effects of symptoms must be considered in terms of any additional physical or mental restrictions they may impose beyond those clearly demonstrated by the objective physical manifestations of disorders. *Symptoms can sometimes suggest a greater severity of impairment than is demonstrated by objective and medical findings alone.*

SSR 82–58 at 122. [emphasis added]

The Appeals Council's assertion that the evidence does not show "impairments reasonably capable of producing the degree of limitations and pain alleged" is also not supported by substantial evidence.

The record is overflowing with uncontraverted x-rays and other expert medical evidence from numerous doctors charting the progression of plaintiff's condition from the date of her injury. X–rays taken immediately following plaintiff's April 24, 1982, injury noted degenerative arthritic changes in plaintiff's left knee. (Tr: 101) Dr. Hicks again noted arthritis throughout the knee in arthroscopic surgery performed the following month. (Tr: 103) Defendant's own physician, Dr. Blink, noted on August 18, 1982, that plaintiff had "degenerative arthritis, knees severe." Tr: 111) He indi-

cated that plaintiff's arthritis was aggravated by her weight problem but noted that an 80–pound weight loss, while desirable, would not necessarily bring improvement. (Tr: 111) By December 1982, Dr. Shelley noted that the arthritis had spread to her right knee and believed this to be caused by her favoring her left knee. (Tr: 248–249) In January, 1983, x-rays confirmed Dr. Shelley's apprehension revealing degenerative arthritis had spread to the ankles and spine. (Tr: 249) The following month her knee gave out and she fell on it causing further aggravation. (Tr: 250) By July, 1983, Dr. Shelley noted indications that plaintiff's arthritis was spreading to her neck and arms. (Tr: 253) Plaintiff's condition continued to deteriorate through August, 1983, and beyond.

As the medical evidence above shows, not only did doctors repeatedly diagnose plaintiff as having arthritis throughout the April 24, 1982—August 1, 1983, period, but the diagnoses also show that it was spreading rapidly and was aggravated by plaintiff's obesity.[48] Arthritis is well known to be a painful disease and plaintiff's doctors ministered to her accordingly. She was constantly on prescribed medication after April 24, 1982. A list of the medications prescribed between that day and August 1, 1983 (many of them for pain), is a corroboration of her complaints: Tylenol with codeine, Motrin, cortisone, Feldene, Darvocet, Indocin, Naprosyn, and Dyazide. (Tr: 101, 108, 247–251) If she discontinued medication for a brief time, such as Dr. Shelley noted on January 20, 1983, it was because plaintiff had severe side effects to the medication and a new medication would quickly be prescribed as a replacement. (Tr: 249–250) In August, 1983, Dr. Finkel noted that plaintiff's pain was resulting in depression and he began to prescribe anti-depressants as well. (Tr: 254) Defendant's own Dr. Bland, reviewing the medical record in 1986, indicated that plaintiff had complied with her doctor's medical advice. (Tr: 301) Thus, gaps in medication use

---

**48.** During the period, plaintiff visited doctors no less than 20 times. All took her condition seriously and none suggested that her complaints were feigned or imagined.

because of the lack of pain are not even suspected.

The immobilizing effects of plaintiff's condition have already been discussed. Plaintiff needed to use crutches throughout the period at issue until her condition deteriorated to the point where Dr. Shelley felt obliged to prescribe wheelchair use. None of the doctors even suggested that plaintiff did not need ambulatory aids.

Important testaments to plaintiff's credibility are presented by persons of defendant's own selection. On August 18, 1982, Dr. Blink gave a solemn prognosis as to the prospects of a weight loss program:

> [it] may improve the pain and difficulty with her knees if she could lose approximately 80 pounds, *but I doubt if it will result in significant improvement.*

(Tr: 111) [emphasis added] Dr. Christensen, defendant's appointed psychologist, termed plaintiff a reliable informant (Tr: 283) whose affect (emotions) were appropriate. (Tr: 284) But most telling of all is the comment of Administrative Law Judge D'Amico at the September 10, 1986, hearing:

> I heard the case once before and I believe [sic] her then and I haven't changed my mind based upon the medical evidence so with respect to her credibility, I'm going to come down on her side. I really don't sse [sic] what that lfeaves [sic] us with today but Counsellor I will give you the opportunity to make any kind of record that you can. And my opinion is not going to change. I still believe that she is disabled from April 24th of 1982. However, my opinion is only recommended. The ultimate decision in this case rests with the Appeals Council.

The Administrative Law Judge, having seen plaintiff in person at two hearings was in a far better position to assess plaintiff's credibility than the Appeals Council which never saw her. The Administrative Law Judge's in-person observations are entitled to considerable weight. *Whitney*, 695 F.2d at 788.

Against this extensive and consistent array of informed medical assessments by doctors who personally dealt with plaintiff, the finding of the Appeals Council stands in solitary contrast. While the finding is a medical judgment, I can find no medical opinion in the record to support it. The members of the Appeals Council are not medical experts, and are not entitled to draw expert medical conclusions. To substitute their judgment for that of qualified physicians was clear error. See *Whitney*, 695 F.2d at 788; *Aubeuf v. Schweiker*, 649 F.2d 107, 112–113 (2nd Cir.1981). The failure to credit plaintiff's testimony as to her pain and limitations of capacity cannot be sustained.

■ Since I have concluded that there is no substantial evidence that plaintiff could perform sedentary work, it will be recommended that defendant's decision be reversed and that plaintiff be awarded benefits from April 24, 1982. Ordinarily a ruling that defendant's use of the grid is not supported by substantial evidence, would result in a remand of a case for the receipt of vocational testimony to determine the availability of other jobs. I am recommending reversal as the appropriate remedy in this case for two reasons. First, plaintiff has been locked in a battle with defendant for nearly six years. She has gone through three hearings, two court reviews, four Administrative Law Judge opinions and four Appeals Council decisions. A further remand would be the fourth in the case. In the elapsed time, plaintiff's physical and mental health has deteriorated and this ordeal could only have aggravated the process.

Conversely, defendant has had countless opportunities to go through the relatively simple task of procuring the testimony of a vocational expert to determine the availability of work to plaintiff. The Appeals Council's several remands indicate that it has not had the least bit of timidity in instructing the Administrative Law Judge to take further evidence. Six years seems time enough to develop a record to meet defendant's Step 5 burden. The comments of the Third Circuit in reversing, rather than remanding, a similar Social Security case are instructive in this case:

Presumably the purpose of such a remand would be to allow another ALJ another opportunity to correct critical omissions and errors made by a previous ALJ.... These deficiencies in the findings of the ALJ are not attributable to any error of the claimant. As noted above, Smith has already had two hearings before an ALJ, followed by two petitions to the Appeals Council, two appeals to the United States District Court which once referred the matter to a U.S. Magistrate and an appeal to this court. The district court judge's opinion which first remanded this case and the Magistrate's Report which underlies the present appeal, both noted that the different ALJ had made eggregious errors in this findings of fact. Must an indigent claimant, who has already battled for seven years, wait with the patience of Job for yet another remand before he can collect the relatively modest amounts available through such an award? We think not. The procedural history of this case approaches what one thoughtful commentator has said some "neutral observers" of the social security administrative process would call "an adjudicatory system wildly out of control." Mashaw, How Much of What Quality? A Comment on Conscientious Procedural Design, 65 Cornell L.Rev. 823 (1980). Under these circumstances, the majority believes a further remand would be unnecessary and a contravention of fundamental justice.

*Smith v. Califano,* 637 F.2d 968, 972–973 n. 1 (3d Cir.1981) [emphasis added]. Another remand, another hearing and the possibility of another court review to allow defendant to procure evidence that he has had years to procure would also create such a contravention of fundamental justice in this case.

The second reason is a much simpler one. I believe that a remand would be pointless, as no reasonable person could conclude on this record that plaintiff was capable of performing any job for eight hours a day. This is very probably true even without the weight of plaintiff's testimony. Since defendant would now be required to credit plaintiff's testimony, a finding of non-disability is beyond imagining.

B. *Step 3*

■ Although a consideration of defendant's Step 3 findings is not necessary to the outcome of this review, it is appropriate, I think, also to note the defendant's non-dispositive error with regard to that issue. Defendant found at Step 3 that plaintiff had a listed obesity impairment as of August 1, 1983, but no listed impairment prior thereto. (Finding of Fact ¶b 5, Tr: 156) Plaintiff's major contention at Step 3 is that defendant failed to determine whether a combination of plaintiff's arthritis and obesity impairments were equivalent to a Step 3 listed impairment before August 1, 1983. I conclude that defendant neglected to consider the issue at all.

That plaintiff had severe impairments is uncontested. Defendant found at Step 1 that plaintiff had not been engaged in substantial activity since April 24, 1982, and at Step 2 that she had severe obesity, arthritis of the spine, knees, ankles and feet. (Finding of Facts # 2 or 3, Tr: 174) [49]

The Secretary has declared that a claimant's combined impairments shall lead to a Step 3 finding of disability when:

> A *combination of impairments* (*none of which meet or equal a listed impairment*), each manifested by a set of symptoms, signs, and laboratory findings which, combined are determined to be medically equivalent in medical severity to that listed set to which the combined sets can be most closely related.
>
> SSR 83–19 at 106 [emphasis added] [50]

Turning first to the requirements for a

---

49. These findings were not disturbed by the Appeals Council. The Appeals Council did reverse the Administrative Law Judge's finding that plaintiff had a severe (Step 2) mental impairment. (Tr: 156)

50. The determination of medical equivalence is governed by 20 CFR §§ 404.1526 and 416.926 which state:

> (a) *How medical equivalence is determined.* We will decide that your impairment(s) is medically equivalent to a listed impairment in

listed arthritis impairment, the pertinent regulation provides:

*Arthritis of a major weight-bearing joint (due to any cause):*

With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination. With:

A. Gross anatomical deformity of hip or knee (e.g., subluxation, contracture, bony or fibrous ankylosis, instability)[51] supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand....

20 CFR § 404, Subpt. A, App. 1, § 1.03. The regulation governing obesity impairments is 20 CFR § 404., Supt. P, App. 1, § 10.10 which puts forward a two-part test.

*Obesity.* Weight equal to or greater than the values specified in Table I for males, Table II for females (100 percent above desired level) and one of the following:

Appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment. If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal. If you have more impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

(b) *Medical equivalence must be based on medical findings.* We will always base our decision about whether your impairment(s) is medically equal to a listed impairment on medical evidence only. Any medical findings in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques. *We will also consider the medical opinion given by one or more physicians designated by the Secretary in deciding medical equivalence.*

(c) *Who is a designated physician.* A physician designated by the Secretary includes any physician employed or engaged to make medical judgments by the Social Security Administration, the Railroad Retirement Board, or a State agency authorized to make disability determinations. [emphasis added]

A. History of pain and limitation of motion in any weight bearing joint or spine (on physical examination) associated with X-ray evidence of arthritis in a weight bearing joint or spine....[52]

Substantial evidence supports a conclusion that plaintiff, while not exhibiting all of the requirements necessary to meet either listing, satisfied or approached enough of the requirements of the two to mandate a consideration of the issue of combined impairments prior to August 1, 1983.

Considering first plaintiff's § 1.03 arthritis impairment, plaintiff, as already discussed, clearly presents a history of joint pain as evidenced by her continuous medical treatment, medication and limitation of activities. All of the doctors examining plaintiff at this time noted that her arthritis is severe. (Tr: 102, 111, 247–249) The limited motion in her left knee was noted by defendant's physician, Dr. Blink, on August 18, 1982. (Tr: 111) Her range of motion was further decreased by her February 1983 fall (Tr: 250) and continued to

51. Morton, § 2.2 at 46–47 defines these terms:

(a) *"Subluxation"*. The bones of the joint are no longer lined up correctly. They are out of normal position.

(b) *"Contracture"*. This may develop when arthritis is so severe that the joint cannot be used very much, if at all. The tissues around the joint—muscles, tendons, and ligaments—may undergo fibrotic degeneration from not being used. This adds to the severity of the arthritis, making it even more difficult for the claimant to use the arthritic joint.

(c) *"Ankylosis"*. This means the fixation of a joint, so that it cannot be moved. Advanced arthritis can cause such destruction of bone that the joint is literally "fused" with abnormal bone or fibrous tissue, so that it cannot be moved.

(d) *"Instability"*. This can be caused by either the damage to the bones of the joint and/or the ligaments that hold the bones in the correct position. An example would be the so-called "trick-knee" that gives way. (A trick-knee is an example of instability, but it is a long way from qualifying under this Listing.)

52. At a height of 65 inches plaintiff must weigh at least 266 pounds (twice the desired 133 pounds) to fulfill the letter of the weight requirement. 20 CFR § 404, Subpt. P., App. 1, § 10.10A, Table II.

be decreased below normal thereafter. (Tr: 252–254)

Plaintiff's mobility deteriorated during this period as arthritis rapidly spread to other weight-bearing joints. All of plaintiff's doctors indicated that plaintiff had a great deal of difficulty moving. She was largely confined to crutches throughout the period. Plaintiff's fall on February 4, 1983, aggravated her arthritis and decreased mobility in her left knee even further. (Tr: 250) By June, 1983, plaintiff's immobility was so severe that Dr. Shelley decided to prescribe limited wheelchair use despite his reluctance to have plaintiff become totally dependent on the wheelchair. (Tr: 252) By August 8, 1983, Dr. Finkel reported that plaintiff could not get around on crutches at all. (Tr: 253) Although plaintiff subsequently was able to return to crutches, she remains dependent on them to the present.[53]

Plaintiff's arthritis progressed rapidly, spreading to multiple joints. As early as May 1982 Dr. Hicks noted, after performing arthroscopic surgery, that plaintiff's arthritis was spread throughout her left knee. (Tr: 103) Because plaintiff favored her left knee, Dr. Shelley noted in December 1982, the arthritis had spread to her right knee. (Tr: 248–249) By the following month x-rays indicated degenerative arthritic changes in the spine and ankles as well. (Tr: 250) The arthritis spread yet further and Dr. Shelley noted indications of arthritis in the neck and arms in July 1983. (Tr: 253)

Plaintiff's arthritis is confirmed by x-ray evidence of joint narrowing. Dr. Hicks noted degenerative arthritic changes as early as April 1982. (Tr: 100–102) Dr. Sorensen noted narrowing of the joint line. (Tr: 247) In January 1983, Dr. Shelley noted compartment narrowing in both legs. (Tr: 249)

Plaintiff also showed some signs of deformity. In January 1983, Dr. Shelley not-ed a small contracture of the left knee. (Tr: 249) Her legs were beginning to bow out of their normal position as well. (Tr: 249) Further the presence of fluid in the knee was noted. The presence of excess fluid (effusion) in a joint is a sign of advanced arthritis. Morton § 2.2 at 46. Dr. Shelley had to drain the left knee on February 4 and again on February 25, 1983, following the fall which aggravated plaintiff's arthritis. (Tr: 250) Fluid was also noted on March 11, 1983, and again on June 17, 1983. (Tr: 252) The knee was drained again on August 25, 1983. (Tr: 254)

Thus, while plaintiff may not have had the gross deformity and significant space narrowing or bony destruction required by § 1.03A, it is obvious that plaintiff's arthritis was advanced and advancing throughout the period following April, 1982, with a corresponding erosion of her ability to walk or stand.

As to plaintiff's obesity, she closely approached the § 10.10A listing requirement throughout the period at issue. The listing's weight requirement is one hundred percent more than the weight defendant deems desirable or normal for a woman of plaintiff's height. § 10.10A, Morton § 2.11 at 84.[54] Plaintiff acknowledges that she did not actually meet the requirement until August 1, 1983. However, every doctor who examined her has described her as obese or grossly so (See e.g., Tr: 100, 102, 110–111, 247), and her weight during this period did approach that of the listing. On August 18, 1982, she weighed 240 pounds in Dr. Blink's office. (Tr: 110) That is only 26 pounds short of the listing, but 107 pounds over what defendant would consider to be the normal 133 pounds. Of that, Dr. Blink (defendant's appointed physician) said that her pain and difficulty with her knees might improve if she were to lose 80 pounds. (Tr: 108) On June 17, 1983, plaintiff weighed 250 pounds, 16 pounds short of the listing but 117 pounds overweight. (Tr: 252) The record suggests no signifi-

---

53. The marked limitations on her ability to walk and stand are the subject of more extended discussion, *supra* p. 1299.

54. Without detracting from the deference which is due the Secretary's regulations, the mere doubling of "normal" weights for purposes of the obesity listing is rather conspicuously a rule of thumb.

cant weight loss at this time and Dr. Blink has indicated that plaintiff's immobility inhibited weight loss. (Tr: 242) Thus, substantial evidence supports a finding that plaintiff's weight was a significant contributing factor to her infirmity throughout the period and was at all times at or in excess of 90% of that required by the listing.

As to the arthritis component of the obesity listing, I need not elaborate further on plaintiff's condition. What does demand emphasis, however, is the fact that the degree of severity of the arthritis necessary to satisfy this section is very low. All that is required in (1) a history of pain and functional limitation of the spine or a *single* weight bearing joint and (2) x-ray evidence of arthritis. 20 CFR §§ 404., Subpt. P, App. 1, § 10.10A. This relatively modest pathological threshold is explained by the profound effect of excessive weight on a weight-bearing joint and on the speed at which further deterioration may be expected to occur in an overweight person. As the Secretary himself explained:

> For example, the subsection dealing with arthritis of a weight bearing joint does not require the evidence of the advanced joint pathology required in the comparable section in the musculoskeletal section [§ 1.00 *et seq.*]. We omitted this criterion for the obese person because we recognize the decreased ability of an impaired joint to bear the stress produced by extreme obesity. We also concede that joint pathology associated with extreme obesity will progress rapidly.

*Johnson v. Secretary of Health & Human Services,* 794 F.2d 1106, 1112–1113 (6th Cir. 1986), quoting 44 Fed.Reg. 18175 (March 27, 1979) [55]

Examining plaintiff's condition in the light of this standard, it must first be noted that the Secretary has already concluded

that plaintiff satisfied what may be referred to as the arthritis component of § 10.10A on the day she attained the listed weight of 266 pounds—August 1, 1983. It would be hard to conclude that plaintiff did not satisfy this low threshold requirement at any time between April 24, 1982, to August 1, 1983. That plaintiff's immobility and history of pain was substantial throughout this period has already been demonstrated. The other requirement is as readily met. X–ray evidence of some arthritis is present from the first examination on April 24, 1982 (Tr: 100, 101), and is periodically reinforced and expanded on May 12, 1982 (Tr: 102), January 20, 1983 (Tr: 249), February 4, 1983 (Tr: 240, 250) and again on August 8, 1983. (Tr: 241)

What is more significant, for present purposes, is the extent to which plaintiff's condition exceeded the minimal evidence of arthritis required under § 10.10 of the listings. Plaintiff's arthritis was not limited to a single joint as required by § 10.10A. Within less than a year of her injury, the condition had spread from the left knee to encompass the spine, both knees and both ankles. (Tr: 249) By July, 1983, it was detected in plaintiff's neck and arms. (Tr: 253) Moreover, as discussed above, plaintiff has met some, but not all, of the requirements of the separate arthritis listing (§ 1.03).

Substantial evidence supports the conclusion that plaintiff met or exceeded some, but not all, of the requirements of the separate obesity and arthritis listings. Whether the combination of these conditions amounts to the medical equivalent of one of the listings is a question for the finder of fact based upon expert medical opinion.[56]

The regulations require that defendant designate a physician to render an opinion on the issue. 20 CFR §§ 404.1526(b), 416.-

---

**55.** This may explain the essentially arbitrary weight requirement of the listing, and invites the obvious observation that where, as here, the minimum requirement is significantly exceeded with regard to joint pathology (*i.e.* multiple joints and rapid deterioration), the deleterious effect of obesity will be just as pronounced at somewhat lower weight levels.

**56.** This question cannot be answered here. At this juncture it is enough to observe that a qualified physician could find that plaintiff had, for example, an impairment which was equal in severity to the obesity listing under § 10.10A.

926(b) [57] Plaintiff contends that defendant erred by failing to obtain this opinion. I agree. Defendant appointed three physicians to consider plaintiff's case. None of them addressed the issue of combined impairments. The only one of these physicians to examine plaintiff during the period at issue was Dr. Blink, who examined plaintiff on August 18, 1982, prior to defendant's decision at the initial level. (Tr: 110–111) He noted plaintiff's weight problem and considered plaintiff to have severe degenerative arthritis of the knees. However, he neither rendered nor was he requested to render any opinion on the application of any of the Step 3 listings to plaintiff's impairments.

Dr. Jakim was requested to apply plaintiff's impairments to the listings. She responded to a medical interrogatory on January 8, 1986, based on her December 9, 1985, exam (Tr: 276–277, 270–272), and did state that plaintiff's combined impairments did not meet the listings. (Tr: 276) This finding, made without any elaboration, is conspicuously flawed. Dr. Jakim answered that she was familiar with the Step 3 listings (Tr: 276) but it is obvious that she was not. This may be explained by the fact that in submitting the questionnaire to Dr. Jakim, defendant attached only the listing for arthritis. (Tr: 277) Dr. Jakim's answers contain no reference to, and do not acknowledge, any listed obesity impairment despite the fact that she diagnosed plaintiff as having arthritis aggravated by obesity in her December 1985 examination report. (Tr: 272) The gravity of this error is emphasized by the fact that plaintiff's satis-faction of the obesity listing was conspicuous. On its next review of the case, on April 2, 1986, the Appeals Council promptly found that plaintiff had a Step 3 obesity impairment as of the very day of Dr. Jakim's exam (December 9, 1985), on which a weight of 270 pounds was recorded. (Tr: 271, 187) As it is evident that Dr. Jakim did not consider the obesity listing at all, it is equally evident that she could not have considered it in combination with the arthritis listing. [58]

On July 21, 1986, Dr. Bland responded to a further medical interrogatory at defendant's request. (Tr: 300–301) She did recognize plaintiff's obesity as a Step 2 impairment; along with arthritis of the spine, knees, ankles and feet; and depression with anxiety. The interrogatory asked whether plaintiff's "impairment(s) (Combination or singly) meet any of the listings." (Tr: 300) [59] Dr. Bland responded that plaintiff's impairments did not meet the listings but the record does not support the conclusion that she actually considered the issue of combined impairments for the period in question. The record sheds no light as to the identity of the record evidence considered by Dr. Bland nor does it indicate what her instructions were. [60] (She did not actually examine plaintiff.) Thus, the evidentiary basis for the opinion is not readily apparent.

Secondly, although Dr. Bland stated that plaintiff's combined impairments do not meet the listings, she also stated in response to another interrogatory question

---

57. See n. 50, *supra.*

58. It bears repeating that Dr. Jakim's findings in December 1985, appear to shed little light on plaintiff's condition between April 24, 1982, and August 1, 1983.

59. As plaintiff points out, the interrogatory only asks whether plaintiff's impairments met the listings and not whether the listings were equalled. An impairment "meets" a listing when the claimant's condition manifests the specific findings for that listing. An impairment equals a listing when it manifests signs, symptoms and medical findings equal in severity, but not necessarily matching, the listed finding. SSR 83–19 at 105.

60. It is worth noting, for example, that Dr. Bland cited the lack of a psychiatric evaluation as a deficiency in the record. However, the record shows that defendant received Christiansen's psychological evaluation and Dr. Brown's psychiatric review on June 9 and 10, 1986, a month prior to Bland's interrogatory. (Tr: 281–299) It is not apparent whether Dr. Bland considered the evaluations inadequate for psychiatric analysis or whether defendant failed to supply her with the evidence. Given the history of this case it would not be fair to plaintiff to indulge the easy assumption that this or any other doctor was necessarily provided with everything a reviewing court might consider appropriate.

that the record she had been provided was insufficient to assess plaintiff's mental and arthritis impairments and their resulting limitations. (Tr: 301) As with Dr. Jakim on the subject of obesity, it is hard to see how Dr. Bland could assess plaintiff's combined impairments when she was unable to evaluate plaintiff's arthritic condition.

The key point which renders Dr. Bland's assessment inadequate was her failure to find that plaintiff *did* satisfy the obesity listing. Her interrogatory responses were prepared three months after the Appeals Council's found (on April 2, 1986) that plaintiff had a Step 3 obesity impairment since December 9, 1985. Either Dr. Bland did not know of the obesity listing or she did not consider it, or, perhaps, she had not been provided with Dr. Jakim's examination report. Whatever the reason, the record leads to the unavoidable conclusion that Dr. Bland did not consider the arthritis or the obesity impairments either together or separately.

Because none of the doctors appointed by defendant considered whether plaintiff's combined impairments met or equalled a listed impairment, plaintiff failed to satisfy the requirements of 20 CFR §§ 404.1526(b), 416.926(b).[61] This was error.[62]

A conclusion of the defendant cannot be sustained when the record contains substantial evidence to support a finding of disability and defendant has failed to elicit the expert proof which his own regulations require as a precondition to that finding. Since no one else can fulfill this proof

requirement, the defendant has the arbitrary and unassailable power to deny any Step 3 claim on this ground unless an affirmative obligation to secure the proof is recognized. This is no idle concern, as the Appeals Council relied upon this very requirement to upset Administrative Law Judge D'Amico's original, April 26, 1985, determination that plaintiff had a Step 3 arthritis impairment on and after April 24, 1982. (Tr: 339–340, 193)

In sum, there is no indication that defendant ever considered the combined impairment issue at all. The Appeals Council's modified finding does state that:

> [p]rior to August 1, 1983, the claimants impairments did not meet or equal the requisite level of severity of the listing of impairments....

(Tr: 156), but there is nothing in either the Administrative Law Judge's or the Appeals Council's opinions to suggest any consideration of possible disability due to combined impairments. To be sure, the requirement that defendant articulate his consideration of an issue is minimal, *Waite v. Bowen,* 819 F.2d 1356, 1359 (7th Cir.1987), but there must be some indication somewhere of the awareness of an issue before its consideration may be inferred.[63]

I therefore conclude, as a further and separate ground for relief, that defendant failed to consider the plaintiff's combined impairments of obesity and arthritis to determine plaintiff's disability at Step 3. But for the order of reversal recommended with respect to Step 5, remand would be in

---

**61.** It is noteworthy that the Administrative Law Judge's final recommendation does not cite any of defendant's appointed physicians in connection with plaintiff's Step 3 of impairment. The Appeals Council's final decision does not cite any of the three physicians at all. (Tr: 169–175, 155–156)

**62.** Defendant also contends that the opinions of his state agency decisionmakers at the initial and reconsideration level considered the issue of combined impairments. However, neither of these virtually anonymous decisions (these non-examining doctors are identified solely by their initials) indicates any consideration of plaintiff's combined impairments. (Tr: 95, 97) Neither decision even acknowledges that plaintiff was obese. These opinions cannot be relied on to satisfy 20 CFR §§ 404.1526(b), 416.926(b).

Moreover, it is unclear from the opinions whether they were prepared by the physicians or prepared by the evaluators with the physician merely reviewing the opinion without reviewing the record. Because the issue of combined impairments was not considered, the issue of whether defendant could rely on these internal reports in a *de novo* review of plaintiff's case need not be considered.

**63.** In *Waite,* 819 F.2d at 1359, the Court of Appeals was satisfied with the Administrative Law Judge's recitation of boilerplate language from the regulation. Whether such an incantation will be enough as to every issue in every case need not be considered here, as the Appeals Council does not mention "combined impairments" or anything resembling that term.

**1310**

order to receive expert opinion and for specific findings.

## RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 USC § 636(b)(1)(B), that defendant's decision be REVERSED, and that this case be REMANDED to defendant for a determination of the amount of SSD and SSI benefits to which plaintiff is entitled based on a disability date of April 24, 1982.

ENTERED this 19 day of April, 1988.